KIEF v. CHICAGO, M. & ST. P. RY. CO.

(Circuit Court of Appeals, Seventh Circuit. October 3, 1916.)

No. 2351.

1. MASTER AND SERVANT ☞265(5)—INJURIES TO SERVANT.

Where the evidence showed that an injury to a servant might have resulted from several causes, for some of which the master was not responsible, the matter cannot be submitted to the jury; there being no doctrine of res ipsa loquitur in such cases.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 881, 898, 955; Dec. Dig. ☞265(5).]

2. MASTER AND SERVANT ☞124(3)—INJURIES TO SERVANT—DUTY OF INSPECTION.

Where a traveling crane in a machine shop was used by servants who were under no duty as to its inspection or maintenance, the master is bound to exercise a high degree of care to keep the crane in proper order to prevent injury to those servants.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 235; Dec. Dig. ☞124(3).]

3. MASTER AND SERVANT ☞285(6)—INJURIES TO SERVANT—ACTIONS—EVIDENCE—JURY QUESTION.

In an action by a machinist in a locomotive machine shop, injured by the falling of a traveling crane, the question whether the injury was the result of defendant's failure to exercise proper care in supervising and inspecting the crane held for the jury.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 1016; Dec. Dig. ☞285(6).]

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

4. MASTER AND SERVANT ⬡⟹285(5)—INJURIES TO SERVANT—ACTIONS—EVI-
DENCE—JURY QUESTION.

In an action by a machinist, injured by the falling of a traveling crane used in a locomotive repair shop, the question whether an inspection just after the accident showed that it did not occur from faults in the crane *held*, under the evidence, for the jury.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 1016; Dec. Dig. ⬡⟹285(5).]

In Error to the District Court of the United States for the Eastern District of Wisconsin.

Action by Joseph A. Kief against the Chicago, Milwaukee & St. Paul Railway Company. There was a judgment for defendant, and plaintiff brings error. Reversed, with directions to grant new trial.

At defendant in error company's locomotive machine shop at Milwaukee plaintiff in error Kief, an experienced machinist, was engaged, with a helper, making repairs on one of the company's locomotives employed in interstate commerce. The shop was equipped with traveling cranes for handling heavy weights. They moved on metal tracks about 18 feet above the floor level of the shop, extending the length of the shop (about 700 feet) along each side, about 40 feet apart, riveted or bolted to the superstructure of the building, supported on uprights or posts set at intervals of about 30 feet. There were no braces between the tracks, the space between being free to permit handling engines at any point. The traveling crane consisted of a heavy I-beam supported at either end on wheels resting on each track. Hanging below the I-beam, and supported by a series of wheels engaging it, was a block and tackle for lifting the desired object. By means of these wheels, the block and tackle could be moved to any point along the I-beam, and a cog mechanism at one end of the I-beam controlled the movement of the crane.

To steady the crane, there was an arm or trailer of angle iron connected with one end of the I-beam, extending diagonally to the opposite track, where its end rested on another such wheel on the track. This formed a V-shaped contrivance, resting on the three wheels upon the tracks—one wheel on one track, and two on the opposite track. The crane was moved to any desired place by means of chains from the cog mechanism, which hung down for manipulation by a man below. The wheels on the track were kept in place by means of a groove or channel in the face of each wheel fitting over the top of the rail.

Work had been done on one side of the engine, and the crane was to be moved for working on the other side. Kief who was on the cab, had thrown the chain over to the other side, and was on his hands and knees getting off the cab, and the helper was manipulating the chain, moving the crane to the position desired, when suddenly the grooved wheel of the trailer left the track, and the trailer, dropping down from its place struck and injured Kief. It is claimed the company was negligent in defectively and insufficiently constructing the crane and tracks, and failing to provide proper safeguards and safety devices, and in failing to do those things reasonably necessary to protect the plaintiff, including proper examination and inspection of the appliance.

At the close of the evidence the District Court directed a verdict for defendant in error. The opinion will state further facts.

H. B. Walmsley and William L. Tibbs, both of Milwaukee, Wis., for plaintiff in error.

R. M. Trump, of Milwaukee, Wis., for defendant in error.

Before KOHLSAAT, MACK, and ALSCHULER, Circuit Judges.

ALSCHULER, Circuit Judge (after stating the facts as above). [1] The direction of the District Court to find for defendant in error

was upon the assumption that the evidence failed to show what caused the trailer to fall, and the authority of Patton v. Tex. & Pac. Ry. Co., 179 U. S. 658, 21 Sup. Ct. 275, 45 L. Ed. 361, and other cases which have followed it, holding generally that res ipsa loquitur has no application in the federal courts as between employer and employé. The teaching of the Patton Case, so far as it has bearing here, may be summed up in these words, quoted from the opinion therein:

"Where the testimony leaves the matter uncertain, and shows that any one of half a dozen things may have brought about the injury, for some of which the employer is responsible and for some of which he is not, it is not for the jury to guess between these half a dozen causes and find that the negligence of the employer was the real cause."

The transcript here can hardly be said to suggest a variety of causes for the accident, some of which might, and others might not, be attributable to the company's negligence. In passing upon the matter the District Court said:

"It may be that the falling of the crane could be accounted for by the want of proper alignment in the track, or by the fact that the crane was out of order, or by the manner in which it was operated."

[2-4] If the track was out of alignment, or the crane was out of order, we find evidence, to which reference will be made, which in our judgment raised a jury question as to whether the company was negligent in this respect; and there was no evidence to warrant the conclusion that negligent operation of the crane caused the accident. In the brief for the company a further possible cause is suggested in some defect which was *perfectly apparent,* meaning thereby to imply that, hazard from such defect being assumed by Kief, no liability could accrue. But the evidence clearly excludes assumption of risk as a possible defense. Kief had absolutely no duty with reference to the crane, except himself or his helper to manipulate the chains for moving it and attaching and handling the load. The duty of inspection, maintenance, and repair rested on others, and the uncontradicted evidence is that Kief had never examined the crane or its mechanism, and had not often used it.

A blueprint, which the company offered in evidence, of the detailed drawings for the cranes in this shop, bears date February, 1885. Foreman Knuller testified that this crane was installed approximately 25 years before the accident; and during all this time it was used for moving these heavy weights. The crane itself is a ponderous affair. The grooves of the three small metal wheels, on which it rests are shown to be 1⅛ inches wide and about ⅝ of an inch deep, fitting quite snugly onto the tracks, which the drawing shows to be rectangular metal bars 1 inch across and 5 inches high, extending on each side the length of the shop. The tracks being about 40 feet apart, and held in place quite independently of each other, cannot be held in relative position as firmly and certainly as where they are spiked or bolted to ties or the like, and it is apparent that slight variation of their relative alignment, less than half an inch, might seriously disturb the movement of the crane, and cause a wheel to leave the track, particularly the wheel

of the trailer, which does not, like the other wheels, have the advantage of the weight of the body of the structure itself to keep it on the track.

So also of the wheels. Slight wearing or unevenness of the flanges, which are constituted by the sides of the grooves, might easily cause the wheel to mount the track and leave it. It requires no evidence or argument to show the deteriorating effect of time and use upon such structures. It is plain that the older they become the greater the needed care and circumspection to keep them in reasonably safe condition. One of the company's witnesses testified that "some of the tracks have a tendency to bend in some places; the timbers are liable to loosen up." Another said, "I find that the bearings on the cranes and the rollers or wheels wear down the quickest and need repair first." It is plain that with such a structure, upon whose practical perfection of condition and operation depends the safety of those beneath who must use it, but who have no duty as to its inspection or maintenance, ordinary care on the part of the employer requires a high degree of vigilance to keep it in proper working order and from being a menace to those working below. The requirement of frequent and thorough inspection of such a structure is plainly not a mere formality, but an important and necessary duty.

General Foreman Knuller's conception of duty in this regard is probably reflected in his testimony when he said, "We make an inspection of these cranes every month." He did not make the inspection himself, and the actual practice did not seem to accord with his statement. Foreman Scholtz, who had worked there about 13 years and had special charge of this work of inspection, said:

"We did not make an inspection of the cranes unless we were ordered to do so. I do not recollect exactly the time when we were ordered to make an inspection of this crane before the date of the accident. I do not remember receiving an order to repair this particular crane before the date of the 'accident.'"

Witness Hausner testified it was his duty since 1904 to make repairs on those cranes, and said:

"I have charge of the stationary gang that repairs these cranes. Whenever anything is reported wrong with them, I go and repair them. I also have charge of repairing the track, if it is out of alignment. Sometimes, when some party says there is something wrong with the crane, or the crane works hard, I send some man up there to inspect it, and sometimes as a rule I get orders from the master mechanic to inspect all those cranes. I do not know the date when I inspected this crane the last time before August 26, 1913."

From this testimony the jury might have inferred that inspection was not made until after it was reported that there was something wrong with the crane, and this might well have been regarded by the jury as falling short of compliance with the duty to examine and inspect. One witness testified that if an inspection was made, and showed a need of repairs, a record was made of it; but there was no evidence from which it appeared that any inspection of this crane or track was made, or any repairs thereon, except the testimony of witness Cyzmanski, who said that in June, two months before the accident, they lined up the tracks and left them and the wheels in first-class condi-

tion, but that he made no examination between that time and the accident, and no other witness testified to the making even of the monthly inspection after that time. The jury might thus have concluded that the duty of inspection, even if reasonably complied with when performed as often as once a month, was in practice an intermittent and neglected function.

It appears that the same wheel left the track, causing the trailer to come down in the same manner, at least once, within a few months before this accident, although there is no evidence of its causing an injury. Several of the company's witnesses testified to such an occurrence, fixing it at different times, so it is not certain from the evidence whether there was one or several of such occurrences within those months. Kief knew nothing of this. Wiedell, his foreman, knew it, but said nothing to Kief about it. Under this state of the evidence we believe that it was fairly a question for the jury whether or not a lack of proper supervision and inspection on the part of the company was the proximate cause of the injury, unless it may be said that the testimony of certain witnesses as to the condition of the crane and the tracks immediately after the injury occurred required the conclusion that all was in proper condition just before, and that no negligence is therefore attributable to the company.

Witness Pettigrew testified that he assisted taking down the crane after the accident, and inspecting every part of it, and finding it, as well as the track, in good condition. But the testimony on that subject of his foreman, Scholtz, might have justified the jury in casting some doubt upon that conclusion. Scholtz, under whose supervision it was taken down, as he says, "to see if everything was O. K.," speaking of the very important subject of the flanges of the wheels, said, "The flanges were in *fair* shape and not worn *to amount to anything;*" and of the tracks he said, "We sighted down the track to see if it was straight, and found it to be in *fair* condition; that included both tracks."

Considering how easily a slight variation of the tracks, and how small an imperfection in the small snugly fitting wheels, might cause the trailer wheel to mount the track and fall from it, the "fair" condition testified to by this foreman, in the judgment of the jury might materially have neutralized the condition of perfection to which his assistant testified; and indeed under the circumstances might have afforded the jury evidence of a lack of that reasonably safe condition which it was appellee's duty to maintain. At any rate, it was for the jury to pass upon the weight of the evidence so given on the condition and operation of the crane and the tracks subsequent to the injury, as bearing on their condition at the time of the accident. This evidence did not as a matter of law preclude recovery, if without it the evidence in this record presents, as we hold it does, a question of fact for the jury whether negligence of the company was the proximate cause of the accident.

The judgment is reversed, with direction to grant a new trial.